**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **[UNDER SEAL]** | : | |
| **Plaintiffs,** | : | **CIVIL CASE NO.** |
| **v.** | : | **FILED** **UNDER SEAL** |
| **[UNDER SEAL]** | : | **JURY TRIAL DEMANDED** |
| **Defendant.** | : | |

**FALSE CLAIMS ACT COMPLAINT**

# DO NOT FILE ON PACER

**DUANE MORRIS LLP**
Michael M. Mustokoff
Daniel R. Walworth
Brett M. Feldman
Jessica Linse
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: +1 215 979 1000
Fax: +1 215 979 1020

*Attorneys for Relator Tricia Lennox Thomas, M.D.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| U.S. ex rel. TRICIA LENNOX THOMAS, M.D.<br><br>Plaintiffs<br><br>vs.<br><br>BURLINGTON COUNTY EYE PHYSICIANS (BURLINGTON COUNTY, NEW JERSEY, DOYLESTOWN AND LANGHORNE, PA); TOTAL EYE CARE (LEVITTOWN, PA); KESSLER MEDICAL, LLC; EYELITE VISION (PORT JEFFERSON STATION, NY); EYECUITY AND ADDITIONAL RELATED ENTITIES OWNED BY MARK LODESPOTO, M.D., INCLUDING BUT NOT LIMITED TO EYELITE VISION (PASSAIC, NJ); EYELITE VISION (PORT JEFFERSON STATION, NY); EYECUITY, PLLC (PALM HARBOR, FL); EYELITE VISION, SWIFTWATER, PA; EYECUITY OF NJ; LODESPOTO MEDICAL, PLLC (AUSTIN, TX); LODESPOTO MEDICINE OF CALIFORNIA, PC (IRVINE, CA); LODESPOTO MEDICAL OF PA (PHILADELPHIA, PA); KESSLER MEDICAL LLC (PORT JEFFERSON STATION, NY); EYECUITY, BELCHERTOWN, MA; MENDELSOHN | :<br>:<br>:<br>:<br>:<br>: | **COMPLAINT FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (b) (2)**<br><br>**CIVIL ACTION NO.**<br><br>**JURY TRIAL DEMANDED** |

| | | |
|---|---|---|
| MEDICAL (SHERMAN, CT); KESSLER MEDICAL RADIOLOGY (BRANFORD, CT); TRIANGLE EYE INSTITUTE (BAKERSFIELD, CA); MENDELSOHN MEDICAL (STONEYBROOK, NY); ECHO MEDICAL DIAGNOSTICS, (VALLEY STREAM, NY); WESTERN NASSAU DIAGNOSTIC IMAGING SERVICES (MERRICK, NY); TODD J. MALTESE, D.O. (RONKONKOMA, NY); THE OPHTHALMIC CENTER (EAST SETAUKET, NY); PJS MEDICAL DIAGNOSTIC (PORT JEFFERSON STATION, NY); BURLINGTON COUNTY EYE PHYSICIANS (BURLINGTON COUNTY, NEW JERSEY, DOYLESTOWN AND LANGHORNE, PA); TOTAL EYE CARE (LEVITTOWN, PA); KESSLER MEDICAL, LLC; EYELITE VISION (PORT JEFFERSON STATION, NY); EYECUITY AND ADDITIONAL RELATED ENTITIES OWNED BY MARK LODESPOTO, M.D., INCLUDING BUT NOT LIMITED TO EYELITE VISION (PASSAIC, NJ); EYELITE VISION (PORT JEFFERSON STATION, NY); EYECUITY, PLLC (PALM HARBOR, FL); EYELITE VISION, SWIFTWATER, PA; EYECUITY OF NJ; LODESPOTO MEDICAL, PLLC (AUSTIN, TX); LODESPOTO MEDICINE OF CALIFORNIA, PC (IRVINE, CA); LODESPOTO MEDICAL OF PA (PHILADELPHIA, PA); KESSLER MEDICAL LLC (PORT JEFFERSON STATION, NY); EYECUITY, BELCHERTOWN, MA; MENDELSOHN MEDICAL (SHERMAN, CT); KESSLER MEDICAL RADIOLOGY (BRANFORD, CT); TRIANGLE EYE INSTITUTE (BAKERSFIELD, CA); MENDELSOHN MEDICAL (STONEYBROOK, NY); ECHO MEDICAL DIAGNOSTICS, (VALLEY STREAM, NY); WESTERN NASSAU DIAGNOSTIC IMAGING SERVICES (MERRICK, NY); TODD J. MALTESE, | | |

| | | |
|---|---|---|
| D.O. (RONKONKOMA, NY); THE OPHTHALMIC CENTER (EAST SETAUKET, NY); PJS MEDICAL DIAGNOSTIC (PORT JEFFERSON STATION, NY); GREG SCIMECA, M.D., VINCENT SARDI, M.D., RICHARD NAIDS, M.D., MARK LODESPOTO, M.D., SCOTT A. SPRINGER, D.O., FREDERIC MENDELSOHN, M.D., JAMES KESSLER, M.D.<br><br>Defendants | | |

**COMPLAINT**

Qui Tam Plaintiff/Relator Dr. Tricia Thomas Lennox brings this civil fraud action against Mark Lodespoto, M.D., Frederic Mendelsohn, M.D., Greg Scimeca, M.D., The Eye Professionals, John Does 1-4 on behalf of the United States of America, the Commonwealth of Pennsylvania, the State of New Jersey, the State of New York, the State of Florida, the State of Texas, the Commonwealth of Massachusetts, the State of California and the State of Connecticut. She alleges, based upon personal knowledge and relevant documents, as follows:

## I. INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of United States of America, the Commonwealth of Pennsylvania, the State of New Jersey, the State of New York, the State of Florida, the State of Texas, the Commonwealth of Massachusetts, and the State of Connecticut arising from false and/or fraudulent records, statements and claims made, used and caused to be made, used or presented by the Eye Professionals, and/or its agents and employees. The fraud perpetrated was in violation of the Federal Civil False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, the New Jersey False Claims Act ("NJFCA"), N.J.S.A. § 2A:32C-1 *et seq.*, the New York False Claims Act ("NYFCA"), N.Y. State Finance Law § 187 *et seq.*, Florida False Claims Act, Fla. Stat. § 68.083(2), Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.001 *et seq.*,

Massachusetts False Claims Act, Mass. Gen. Laws Chap. 12 § 5 *et seq.*, Connecticut False Claims Act, § 17b-301a *et seq.*, and the California False Claims Act, Cal. Gov't Code § 12650 et seq. ("CA FCA").

2. Relator has witnessed Transcranial Doppler ("TCD") testing being ordered by the Defendant physicians at the Defendant ophthalmic practices with no evidence of the quantitative signs, symptoms or the required medical reasoning necessary to justify the tests.

3. The Defendants billed Medicare for unnecessary and inappropriate diagnostic medical tests and bundled codes (93886, 93890, 93892) to increase reimbursement.

4. The Defendants used inappropriate diagnostic codes to get the unnecessary tests covered, while the medical charts did not have any documentation to justify the diagnostic testing.

5. The Defendants' diagnostic company, Eyelite Vision, was given access to electronic medical records in advance to select patients based on Medicare insurance, past medical history and past ocular history, despite these patients not having a need for the testing.

6. The ordering of the TCD testing was done by the diagnostic testing company Eyelite Vision and not by the referring physician.

7. The referring physician had no knowledge that the tests were performed until after the testing had been performed, when the physician was to sign the order sheet.

8. The referring physician received a kickback for providing patients to the diagnostic company.

## II. PARTIES

9. Plaintiff/Relator, Tricia Lennox Thomas, M.D., is a board certified ophthalmologist, specializing in the treatment of glaucoma and a resident of Pennsylvania.

10. Greg Scimeca, M.D., is a medical doctor specializing in ophthalmology. He is a resident of New Jersey and the owner of The Eye Professionals.

11. Vincent Sardi, M.D., is a medical doctor specializing in Ophthalmology. His a resident of New Jersey.

12. Richard Naids, M.D., is a medical doctor specializing in Ophthalmology. He is a resident of Pennsylvania.

13. Mark Lodespoto, M.D., is a medical doctor specializing in Diagnostic Radiology, specifically Neuroradiology. He is a resident of New York and the owner of Eyecuity and related entities.

14. Scott A. Springer, D.O., is an osteopathic doctor specializing in Diagnostic Radiology. He is a resident of New York.

15. Frederic Mendelsohn, M.D., is a medical doctor specializing in Neurology and Psychiatry. He is a resident of New York and the owner of Mendelsohn Medical.

16. James Kessler, M.D., is a medical doctor specializing in Diagnostic Radiology, specifically Neuroradiology. He is a resident of New York and the owner of Kessler Medical Radiology.

17. James Rausch is the Sales Director of Defendant Eyelite Vision

18. Burlington County Eye Physicians, owned by Greg Scimeca, M.D. (Burlington County, New Jersey, and Langhorne, PA);

19. Total Eye Care (Levittown, PA);

20. Kessler Medical, LLC, owned by James Kessler, M.D. (Branford, CT);

21. Eyecuity and additional related entities owned by Mark Lodespoto, M.D., including but not limited to Eyelite Vision (Passaic, NJ);

a. Eyelite Vision (Port Jefferson Station, NY);

b. Eyecuity, PLLC (Palm Harbor, FL);

c. Eyelite Vision, (Swiftwater, PA);

d. Lodespoto Medical, PLLC (Austin, TX);

e. Lodespoto Medicine of California, PC (Irvine, CA);

f. Lodespoto Medical of PA (Philadelphia, PA);

g. Kessler Medical LLC (Port Jefferson Station, NY);

h. Eyecuity, (Belchertown, MA);

i. Mendelsohn Medical (Sherman, CT);

j. Kessler Medical Radiology (Branford, CT);

k. Triangle Eye Institute (Bakersfield, CA);

l. Mendelsohn Medical (Stoneybrook, NY);

m. The Ophthalmic Center (East Setauket, NY);

n. PJS Medical Diagnostic (Port Jefferson Station, NY)

## III. JURISDICTION AND VENUE

22. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to the Federal False Claims Act ("FCA"), 31 U.S.C. §3729, *et seq.* and Antikickback Statute 41 U.S.C. §51, *et seq.*

23. Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Relator, moreover, would qualify under that section of False Claims Act as an "original source" of the allegations in this Complaint, even had such a public disclosure occurred.

24. The Court has subject matter jurisdiction over Defendant's violation of the NJFCA, the NYFCA, Florida False Claims Act, Texas Medicaid Fraud Prevention Law, Massachusetts False Claims Act, and the Connecticut False Claims Act pursuant to 31 U.S.C. § 3732(b) because

Defendant's violation of the NJFCA, the NYFCA, Florida False Claims Act, Texas Medicaid Fraud Prevention Law, Massachusetts False Claims Act, and the Connecticut False Claims Act and the federal FCA all arise out of a common nucleus of operative facts. *See also* 31 U.S.C. § 3732(b) (granting district courts jurisdiction over any action brought under the laws of any state for the recovery of funds paid by a state if the action arises from the same transaction or occurrence as an action brought under the federal FCA).

25. This Court has personal jurisdiction and venue over Defendants pursuant to 28 U.S.C. §§ 1391 (b) and 31 U.S.C. § 3732(a) because those sections authorize nationwide service of process and because each Defendant has minimum contacts with the United States. Moreover, upon information and belief Defendant can be found in, resides and transacts business in the Eastern District of Pennsylvania. Specifically, Burlington County Eye Physicians maintains active practices in Langhorne and Doylestown, Pennsylvania. Dr. Vincent Sardi is a member of Burlington County Eye Physicians and also practices with Total Eye Care in Levittown, PA, located at 1568 Woodbourne Road, Levittown, PA 19057. Further, Dr. Mark Lodespoto maintains an Eyelite Vision location at 1500 Market Street in Philadelphia, as well as other facilities in Doylestown and Allentown, PA.

## IV. APPLICABLE LAW

### A. Federal False Claims Act

26. The federal FCA provides, in pertinent part:

> (a) Any person who: (1) knowingly presents, or causes to be presented, to an officer or employee of the United States government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false claim allowed or paid, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus three (3) times the amount of damages which the Government sustains as a result of the act of that person.

27. For purposes of this section, the term "knowing" and "knowingly" mean that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent is required.

**B. New Jersey False Claims Act**

28. The NJFCA became effective on March 13, 2008 and is modeled after the federal False Claims Act.

29. The NJFCA provides liability for any person who:

> (1) knowingly presents, or causes to be presented, to employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State; (3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the state, is jointly and severally liable to the State for a civil penalty of not less than and not more than the civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729 et seq.). NJFCA, § 2A:32C-3.

30. For purposes of the NJFCA, the terms "knowing" and "knowingly" mean that a person, with respect to information: (1) has actual knowledge of the information; or (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. NJFCA § 2A:32C-2.

31. The NJFCA provides for civil penalties of not less than $5,500 and not more than $11,000, plus three (3) times the amount of damages, which the government sustains as a result of the act of that person.

**C. New York False Claims Act**

32. The NYFCA became effective in April of 2007 and is modeled after the federal False Claims Act.

33. The NYFCA provides liability for any person who:

> (1) knowingly presents, or causes to be presented, to any employee, officer or agent of the State or local government, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a local government; (3) conspires to defraud the state or a local government by getting a false or fraudulent claim allowed or paid, shall be liable to the state and local government for a civil penalty of not less than six thousand dollars and not more than twelve thousand dollars, plus three (3) times the amount of damages which the State and/or local government sustains.

34. For purposes of the NYFCA, the terms "knowing" and "knowingly" mean that with respect to a claim, or information relating to a claim, a person: (a) has actual knowledge of such claim or information; (b) acts in deliberate ignorance of the truth or falsity of such claim or Information; or (c) acts in reckless disregard of the truth or falsity of such claim or information.

**D. Florida False Claims Act**

35. Fla. Stat. § 68.082(2) provides liability for any person who:

> (1) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.

36. For purposes of the Florida False Claims Act, the terms "knowing" or "knowingly" mean, with respect to information, that a person: (a) has actual knowledge of the information; (b) acts in deliberate ignorance of the truth or falsity of the information; or (c) acts in reckless disregard of the truth or falsity of the information.

**E. Texas Medicaid Fraud Prevention Law**

37. Tex. Hum. Res. Code § 36.002 provides liability for any person who:

> (1) knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid Program that is not authorized or that is greater than the benefit or payment that is authorized:
>
> (2) knowingly conceals or fails to disclose information that permits a person to receive  benefit or payment under the Medicaid Program that is not authorized or is greater than the benefit or payment that is authorized;
>
> (4) knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:
>
> ***
> (B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program.

**F. Massachusetts False Claims Act**

38. Mass. Gen. Laws Chap. 12 § 5B provides liability for any person who-

> (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

**G. Connecticut False Claims Act**

39. The Connecticut False Claims Act, §17b-301a *et. seq.* provides liability for any person who:

> (1) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval under a state-administered health or human services program;
>
> (2) knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claims under a state-administered health or human services program.

**H. California False Claims Act**

40. The California False Claims Act, Cal. Gov't Code § 12651 (a), provides liability for any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof, a false claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;
>
> (3) conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.
>
> . . .
>
> (B) is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

## I. Medicare and Medicaid Regulatory Background

41. Medicare was created in 1965 as part of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, to provide a federally-funded health insurance program for the aged and disabled. The United States, through the Department of Health & Human Services ("HHS"), administers the program, and has delegated the administration of Medicare to Centers for Medicare & Medicaid Services ("CMS"), a component of HHS. Another component of HHS, the Office of Inspector General ("OIG"), is responsible for investigating Medicare fraud and abuse, as well as issuing regulations and instructions that implement the Medicare and Medicaid fraud and abuse authorities.

42. The Medicare program consists of two basic parts - Part A (42 U.S.C. §§ 1395c - 1395i-5) and Part B (42 U.S.C. §§ 1395j - 1395w-4).

43. Part A of the Medicare Program covers all inpatient hospital services and post-hospital nursing facility care to eligible persons, known as Medicare beneficiaries. In addition, Part A covers certain home health services provided to Medicare beneficiaries who do not have Part B coverage.

44. Part B of the Medicare Program, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, both inpatient and outpatient, diagnostic services and durable medical equipment as long as the services are medically necessary.

45. Medicare makes payments under Part A and Part B using private companies and insurance companies ("contractors") which provide these services under a contract with the Health Care Financing Administration ("HCFA"). The private companies pay Medicare claims and determine the amount of reimbursable costs based on coverage and reimbursement policies established by Medicare. The same private companies are also responsible for identifying fraud and abuse under guidelines established by the OIG.

46. Medical treatment and services by physicians that are reimbursable under the Medicare Part B and Medicaid Programs must be reasonable and medically necessary. The physician or entity seeking reimbursement, including Defendants herein, must meet certain obligations to participate as a Medicare provider, including the following duties to:

a. Bill for only reasonable and necessary medical services. 42 U.S.C. § 1395y(a)(l)(A);

b. Not make false statements or misrepresentations of material facts concerning requests for payment. 42 U.S.C. § 1320a-7b(a)(l) & (2); 1320a-7; 1320a- 7a;

c. Provide economical medical services, and then, only where medically necessary. 42 U.S.C. § 1320c-5(a)(l);

d. Provide evidence that the service given is medically necessary. 42 U.S.C. § 1320c-5(a)(3);

e. Assure that such services are not substantially in excess of the needs of such patients. 42 U.S.C. § 1320a-7(b)(6) & (8);

f. Not submit or cause to be submitted bills or requests for payment substantially in excess of the physician's usual charges for the same treatment or services. 42 U.S.C. § 1320a-7(b)(6)(A);

g. Certify when presenting a claim that the service provided is a medical necessity. 42 U.S.C. § 1395n(a)(2)(B).

47. CMS determines the types of services covered and reimbursable. The types of services covered must correlate to the appropriate medical condition for which the service is being provided.

48. Medicaid, as distinguished from Medicare, is a federal health insurance system that is administered by the states and is available to low-income individuals and families who meet eligibility requirements determined by federal and state law (herein referred to as "Medicaid beneficiaries" or "Medicaid recipients"). Medicaid pays for items and services pursuant to plans developed by the states and approved by HHS through CMS. 42 U.S.C. § 1396a(a)-(b). States pay health care providers according to established rates, and the federal government then pays a statutorily established share of "the total amount expended ... as medical assistance under the State plan." See 42 U.S.C. § 1396b(a)(l).

49. States electing to participate in the Medicaid program must comply with the requirements imposed by the Social Security Act and regulations promulgated by the Secretary of HHS. States participating in the Medicaid program created various state Medicaid programs, waiver programs, and the like, which reimburse healthcare practitioners, healthcare facilities, home healthcare agencies, and/or healthcare plans for rendering Medicaid-covered services to Medicaid beneficiaries.

50. According to CMS, approximately 20% of Medicare beneficiaries are also enrolled in Medicaid.

## V. ALLEGATIONS

### A. Medical Billing Codes and Diagnostic Codes

51. Each year the American Medical Association publishes a new edition of Current Procedural Terminology ("CPT").

52. CPT codes represent the standard method for the billing and reporting of medical procedures nationwide, by assigning each procedure within the medical, osteopathic, and chiropractic literature a number. Insurance plans, including Medicare and Medicaid, set reimbursement rates for each coded procedure.

53. In 1983, Congress empowered the Secretary of HHS to enter into an agreement with the American Medical Association to use CPT codes for reporting physicians' services, including diagnostic procedures, under the Medicare Program.

54. In 2000, following the passage of the Health Insurance Portability and Accountability Act (HIPAA), the CPT was designated as the national coding standard for physician and other healthcare professional services, including the outpatient radiological and imaging services described in this Complaint.

55. Code 93892 relates to Emboli detection without IV microbubble injection and translates into a $351.72 NJ 2019 Medicare fee.

56. Code 93890 is for a Vasoreactivity Study and translates into a $312.39 NJ 2019 Medicare fee.

57. 93886 Transcranial doppler study of the intracranial arteries, complete study and translates into a $306.64 NJ 2019.

58. A TCD is an intracranial neurovascular exam. It is a non-invasive, painless ultrasound technique that uses high-frequency sound waves to measure the rate and direction of blood flow inside vessels. The test examines and records the speed of the blood flow in arteries known as the Circle of

Willis, which are located at the base of the brain, to facilitate the diagnosis of a wide range of conditions affecting the brain including: Subarachnoid hemorrhage (SAH), Transient Ischemic Attack (TIA), Sickle Cell Anemia, Embolism, Cerebrovascular Accident (CVA) and Cerebral Circulatory Arrest.

59. Defendant Eyelite bundled codes 93892, 93890, 93886, requiring all three be used when ordering a TCD test. In fact, the TCD order sheet states: "By signing this form you are ordering a complete TCD test for your patient, involving all three CPT codes."

60. The Medicare Local Coverage Article divides the billing and coding for non-invasive cerebrovascular arterial studies into two separate categories. Group 1 codes (93880 and 93882) are for extracranial ultrasound studies, which is the carotid doppler ultrasound of the neck.

61. These two CPT codes have a long list of ICD-10[1] codes that support medical necessity including many ophthalmology codes. These ICD-10 codes list the diagnoses necessary for the corresponding CPT codes.

62. Group 2 codes (93886, 93888, 93890, 93892 and 93893) have a more limited list. The only ophthalmology ICD-10 code on the group 2 list is: G45.3 (Amaurosis fugax).

63. The ICD-10 codes used by the defendants to support the TCD testing were G45.0, which is related to Vertebrobasilar insufficiency (also called vertebrobasilar artery syndrome) ("VBS") and the other is Occlusion/stenosis of other cerebral arteries without cerebral infarction.

64. VBS is a rare condition and refers to a condition in which blood flow to the vertebral and basilar arteries are restricted, thereby providing transient insufficient blood flow to the posterior

[1] The ICD-10-CM (International Classification of Diseases, Tenth Revision, Clinical Modification) is a system used by physicians and other healthcare providers to classify and code all diagnoses, symptoms and procedures recorded in conjunction with hospital care in the United States

portions of the brain. This condition is typically serious and can even be deadly. Symptoms include vertigo, dizzy, lightheaded, syncope, diplopia, weakness, TIA, dysarthria, dysphagia, ataxic gait, nausea, numbness, nystagmus and visual disturbances.

65. VBS occurs in less than 200,000 cases a year in the United States.

66. According to the CDC, there were only 1,332 cases of VBS in New Jersey last year and only 76 in Burlington County, where the testing and referrals took place.

67. Yet, Dr. Lennox Thomas' former employer referred approximately *30 cases a week* for testing for VBS using TCD.

68. Many of the patients at The Eye Professionals had the G45.0 code listed by Eyelite in their patient files. However, these patients neither had the G45.0 code on their patient files nor the symptoms corresponding to a G45.0 code on the day of testing.

69. The patients also did not have a past medical history to support the recorded diagnosis.

70. G45.0 and I66.8 are listed as ICD-10 codes that support medical necessity for 93880 and 93882 not the procedures done by Eyelite, which were procedures tied to code 93886, 93890 and 93892.

71. The ICD-10 diagnosis codes G45.0 and I66.8 are not common codes used in ophthalmology.

72. In fact, these codes are so uncommon that The Eye Professionals' electronic medical records system did not even have these ICD-10 codes loaded into the system.

**B. The Physicians Perpetrating the Fraud**

73. There are two physician practices and their related entities funding and directing a kickback scheme occurring across the country.

74. One of the physicians is radiologist, Mark Lodespoto, M.D.

75. Dr. Lodespoto has ownership interests in test interpretation sites in at least 8 states: Pennsylvania, New York, Florida, Connecticut, New Jersey, Texas, and Massachusetts.

76. Dr. Lodespoto is currently licensed to practice in twelve different states.

77. The other test interpreting physician is a neurologist, Frederic Mendelsohn, M.D.

78. Lodespoto and Mendelsohn place technicians certified in TCD testing in every ophthalmic practice.

79. In return, the practices pay a rental fee for the equipment.

80. Although the technicians performing the screening function are properly certified, they do not employ their training in designating patients for TCD testing.

81. Patients are selected for TCD testing before they are even seen by the physician, based on whether the patients are covered by Medicare.

82. The ophthalmologists sign the prescription for the test after the test has been completed.

83. In turn, the ophthalmologists receive a kickback of $150.00 for every test ordered.

84. Some of the patient medical records reviewed by the Relator showed no record of the physical findings necessary to justify the test or any notation by the physician of either recording or make use of the test results.

85. Instead of restricting recommendations for testing to those patients actually exhibiting the signs and symptoms that might justify the testing, any patient showing signs of obesity or moderately high blood pressure was subjected to TCD testing.

### C. The Eye Professionals – The Ophthalmology Practice

86. Relator worked at Defendant Eye Professionals from September 16, 2013 until February 2, 2020. The practice's principal shareholder is Defendant Greg Scimeca, M.D.[2]

87. The other physicians at Eye Professionals who participated in the scheme are Richard Naids, M.D. and Vincent Sardi, M.D.

88. Eye Professionals is a relatively large practice with approximately 14,000 patients.

89. In January 2020, Eye Professionals acquired the practice of Dr. Sanjay Kamat, adding an additional 4,000 patients from Bucks County, Pennsylvania.

90. The Bucks County patients were then seen in Eye Professionals' Langhorne office and referred to Burlington County for TCD testing.

91. From the outset of Relator's employment, she questioned the professionalism in practice operations concerning medical documentation, patient management and quality of care.[3]

92. The equipment was out of date.[4]

93. Beginning in 2019, CMS reduced the levels of reimbursement for various levels of cataract surgery, evidently prompting a perceived need to replace lost revenue.

94. On May 14, 2019, The Eye Professionals began doing its first TCD testing.

---

[2] Although the Relator's first-hand observation is limited to the falsified TCD testing, she is also aware of multiple instances where staff members accused Dr. Scimeca of upcoding and performing unnecessary medical procedures. Our Complaint will reference allegations that Dr. Scimeca was performing combined cataract/glaucoma procedures (ECP, Istent, Hydries, Cypass, MIGS) Dr. Lennox Thomas has reviewed some patient files that confirm the allegations where there was insufficient medical work up <u>and</u> which were medically unnecessary.

[3] Attached is a written directive to the Relator limiting the amount of detail she was to include in her recordkeeping – advice she ignored. (Attached as Exhibit "3")

[4] It may be questionable as to whether the equipment and software on hand at Eye Professionals was sufficient to do the testing.

95. The screening of patients was performed by Kristina Johansen, an employee of Defendant Dr. Lodespoto, a neuro-radiologist and owner of multiple alleged test sites doing business as Defendants Eyecuity and Eyelite Vision. Johansen worked for Eyecuity.[5]

96. At the time, Relator had almost no familiarity with TCD testing.[6]

97. Within days of The Eye Professionals beginning testing, Relator was given three previously filled out requests for TCD testing of three of her patients, one of whom she had been closely following, and two others with whom she was completely unfamiliar.

98. Not one of the patients met Medicare's TCD testing criteria nor showed any of the signs or symptoms of VBS or vascular stenosis, as indicated by Relator's research. In one of the cases, that of a patient R.S., a longtime patient, Relator had a concern that the testing would do severe damage to an eye that had recently undergone surgery.

99. The screening used to justify the testing was simply a medical history of either hypertension or hyperlipidemia.

100. Because no quantitative data was provided in her patients' charts, there could be no evidence of medical justification.

101. Once Relator became suspicious, she began to review the charts of patients who had been tested.

102. The Eye Professionals had previously filled out TCD order sheets for patients possessing none of the criteria justifying the medically unnecessary test.

---

[5] Ms. Johansen continued to do testing despite state and federal Covid pandemic prohibition, unnecessarily exposing patients to risk of serious illness.

[6] When Dr. Lennox Thomas asked for medical authority concerning TCD and it indications, she received outdated publications from questionable foreign sources and non-peer reviewed articles.

103. The attending physician was expected to sign off on the procedure, which Relator would not do. Relator has medical records for patients who ultimately received the unnecessary testing.

104. The Relator questioned Defendant James Rausch, who identifies himself as Sales Director for Defendant Eyelite Vision. He confirmed that only Defendant Dr. Lodespoto would be interpreting the tests for all of their patients.

105. The Relator's additional investigation revealed that although Medicare reimbursed 80% of the TCD test cost, neither secondary insurance nor the patient were being billed the remainder by either The Eye Professionals or Eyecuity/Eyelite Vision.

106. Relator, acting upon information and belief, alleges that the billing of patients or secondary insurance was a deliberate effort to avoid scrutiny of the TCD costs by other payors/patients and to further conceal the fraudulent scheme.

107. Relator also determined that no other teaching hospital or academic glaucoma practice was routinely doing the TCD test.

108. Relator was able to confirm the existence of the kickbacks based on her own records.

109. Relator received $900.00 for calendar year 2019 as a result of her testing sign off on two patients who actually required the testing based on her examination.

110. Relator was also able to confirm that the practice at The Eye Professionals was to order "screen for strokes and perform the testing before the patient saw the doctor."

111. As recently as September 3, 2020, Relator received further confirmation of the false TCD testing taking place in Pennsylvania.

112. One of her former patients saw Dr. Vincent Sardi in his office, Total Eye Care of Levittown.

113. Dr. Sardi is a retinal specialist for at least four (4) different practices.

114. When the patient visited Dr. Sardi's Levittown office, the patient was sent to New Jersey to undergo a "blood flow test".

115. The patient was pressured to take the test, despite initially declining, and she never received a bill or Explanation of Benefits from Medicare.

116. The patient never received test results when she revisited the office several weeks later. As noted, despite her two attempts, Relator has yet to receive those records. (See attached as Exhibit "1").

**D. The Test Interpreters/Entrepreneurs Eyecuity And Eyelite Vision, Dr. Mark Lodespoto And Dr. Frederic Mendelsohn**

117. Mark Lodespoto, MD is responsible for the placement of his employee/technicians, like Kristina Johansen at The Eye Professionals, in other ophthalmology test sites around the country.

118. Locations for both of his companies are found in a number of states. Eyecuity and Eyelite Vision has sites in various virtual offices around the country.[7]

119. Relator's personal investigation revealed that many of the sites did not appear to be the type normally associated with physician offices.

120. For example, the New Jersey office was in an abandoned rubber factory. The Florida address was a personal beach house with pool.

[7] Whether the sites identified as offices are anything more than mail drops, is subject to question. For example, the Florida office for Eyelite/Eyecuity, is a Florida beach house. The Connecticut and Massachusetts offices are lake houses. The Texas, California and Pennsylvania locations are Regus virtual offices. One office is in Philadelphia at 1500 Market Street; a second office in Pennsylvania is a Parcel Plus mail box. Lodespoto's Doylestown, PA office bears a taxonomy code, 2085H002X, indicating its purpose as Hospice and Palliative Medicine. Eyelite is currently advertising for a TCD technician for its Allentown office.

121. Dr. Lodespoto is no stranger to False Claims prosecutions. A Google search shows him to have worked at Defendants Imaging Services, the defendant in a District of New Jersey prosecution, *U.S. ex rel. Novick vs. Doshi Diagnostic Imaging Services*, No. 1:09-cv-04992 (D. N.J.). More recently, he was named as a defendant in *U.S. ex rel. Schaller vs. Premier Diagnostic Imaging Corp.*, No. 2:12-cv-05579 (E.D. N. Y.) Many of the allegations as to precertification and incentives set forth in those Complaints mirror the observations of the Relator in this action.

122. Defendants Lodespoto and Mendelsohn are Medicare's highest billers for TCD testing including both the technical and professional component. (*See* attached charts at Exhibit "2").[8]

123. There is an overlap in seven fax numbers for offices owned by either Mendelsohn or Lodespoto. In addition, a Dr. James Kessler and a Dr. Scott A. Springer, D.O. appear to be doing work for both Mendelsohn and/or Lodespoto.

124. Despite the number of offices all billing for Lodespoto was under his NPI number, both Lodespoto and Mendelsohn are consistently Medicare's two top billers for CPT codes 93880, 93886, 93890, 93892.[9]

125. A review of the total billings for Lodespoto and Mendelsohn show them to exceed any other provider in significant numbers.

126. Although Mendelsohn appears to have retired from clinical medical neurology in 2015 according to his website, he continued to bill Medicare for TCD testing in 2016 and 2017.

[8] Attached is the most recent available data, 2015-2017 from Medicare. More current information will soon be made public, particularly 2018 Medicare data.

[9] Attached as Exhibit "2" are charts prepared by the Relator identifying provider and utilization data for TCD testing. The information is limited to 2015-2017 because Medicare has yet to publish more recent data.

127. Further analysis of the Medicare data for individual provider patient demographics shows that more than two-thirds of Lodespoto's and Mendelsohn's patients had hypertension and hyperlipidemia which is the same criteria used by Kristina Johansen at The Eye Professionals to justify TCD testing.

128. The Medicare demographics data shows that the actual number of patients treated by Lodespoto and Mendelsohn as having had a stroke to be very low.

129. Both physicians appear to have a business relationship with a Dr. James Kessler. In addition, they appear to share fax numbers and office space at 18 Pinewood Shores in Sherman, Connecticut.

**COUNT I**
**VIOLATION OF FALSE CLAIMS ACT**

130. Relator realleges Paragraphs 1 through 129 as though fully set forth herein.

131. Defendants knowingly presented, and/or caused to be presented claims for payment for TCD testing to the federally-funded programs in New Jersey, New York, Florida, Texas, Massachusetts, California and Connecticut.

132. The claims Defendant submitted relating to reimbursement for ultrasounds, Doppler studies, and multiplanar reconstruction were false claims submitted in violation of the FCA. Defendant knew, or acted in reckless disregard, of the fact that it was ineligible for the payments demanded due to double billing and billing for procedures that were not medically necessary.

133. Claims submitted by Defendant to federally-funded health insurance programs (including Medicare and Medicaid) relating to all procedures billed in Defendants' New Jersey, New York, and Florida locations constitute violations of the federal False Claims Act, 31 U.S.C. § 3729(a)(1).

134. Defendant, through its concerted efforts to carry out its systematic scheme to obtain fraudulent payments from Medicaid and Medicare, caused to be made or used false records or statements, including but not limited to the Medicare enrollment forms, the Medicaid enrollment forms, CMS 1500 forms, billing sheets, and internal records to get false or fraudulent payments in violation of the federal False Claims Act, 31 U.S.C.§ 3729(a)(2).

135. In addition, Defendant physicians who referred patents for testing received kickbacks for the referrals suggested by the Eyelite vision in violation of Antikickback Statute 41 U.S.C. § 51, *et seq*.

136. All of Defendant's conduct described in the Complaint was knowing, as that term is used in the federal False Claims Act.

WHEREFORE, Relator requests the following relief:

To the United States:

(1) Three times the amount of damages sustained by the United States as a result of Defendant's actions;
(2) A civil penalty of $11,000 for each violation of the federal False Claims Act;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) 25% of the proceeds recovered in this action if the United States elects to intervene, and 30% if it does not;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorney's fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT II**
**VIOLATION OF NEW JERSEY FALSE CLAIMS ACT**
**(Plaintiffs v. Greg Scimeca, M.D., Vincent Sardi, M.D., Richard Naids, M.D., Mark Lodespoto, M.D., Scott A. Springer, D.O., Frederic Mendelsohn, M.D., James Kessler, M.D., Burlington County Eye Physicians, Eyecuity, Eyelite Vision)**

137. Relator re-alleges Paragraphs 1 through 136 as though fully set forth herein.

138. Defendants knowingly presented, and/or caused to be presented claims for payment for diagnostic radiological studies to the New Jersey state-funded health insurance programs.

139. The claims Defendants submitted relating to reimbursement for TCD testing were false claims submitted in violation of N.J.S.A. § 2A:32C-3(a). Defendant knew, or acted in reckless disregard, of the fact that it was ineligible for the payments demanded due to double billing and billing for procedures that were not medically necessary.

140. Claims submitted by Defendants to the New Jersey state-funded health insurance programs (including Medicare and Medicaid) relating to all procedures billed in Defendants' New Jersey locations, constitute violations of the NJFCA.

141. Defendants, through their concerted efforts to carry out its systematic scheme to obtain fraudulent payments from Medicaid and Medicare, caused to be made or used false records or statements, including the Medicaid enrollment forms, CMS 1500 forms, billing sheets, and internal records to get false or fraudulent payments in violation of the NJFCA § 2A:32C-3(a).

142. In addition, Defendant physicians who referred patents for testing received kickbacks for the referrals suggested by the Eyelite Vision in violation of New Jersey Antikickback Statute, N.J. Stat. Ann. § 2C:21- 10(a)(3), (c)

143. All of Defendants' conduct described in this Complaint was knowing, as that term is used in the New Jersey False Claims Act.

WHEREFORE, Relator requests the following relief:

To the state of New Jersey:

(1) Three times the amount of actual damages which the state of New Jersey has sustained as a result of Defendant's conduct;
(2) A civil penalty of $11,000 for each violation of the New Jersey False Claims Act;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) 25% of the proceeds recovered in this action if the State of New Jersey elects to intervene, and 30% if it does not;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorney's fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT III**
**VIOLATION OF NEW YORK FALSE CLAIMS ACT**
**(Plaintiffs v. Mark Lodespoto, MD, Eyelite Vision, Kessler Medical LLC, Mendelsohn Medical, The Ophthalmic Center, PJS Medical Diagnostic)**

144. Relator re-alleges Paragraphs 1 through 143 as though fully set forth herein.

145. Defendants knowingly presented, and/or caused to be presented claims for payment for diagnostic codes to the New York state-funded health insurance programs.

146. The claims Defendant submitted relating to reimbursement for TCD testing were false claims submitted in violation of NYFCA § 189(a). Defendant knew, or acted in reckless disregard, of the fact that it was ineligible for the payments demanded due to double billing and billing for procedures that were not medically necessary.

147. Claims submitted by Defendants to New York state-funded health insurance programs (including Medicare and Medicaid) relating to all procedures billed in The Eye Professional's New York locations, constitute violations of the NYFCA.

148. Defendants, through their concerted efforts to carry out their systematic scheme to obtain fraudulent payments from Medicaid and Medicare, caused to be made or used false records or

statements, including the Medicaid enrollment forms, CMS 1500 forms, billing sheets, and internal records to get false or fraudulent payments in violation of the NYFCA § 189(a).

149. In addition, Defendant physicians who referred patents for testing received kickbacks for the referrals suggested by the Eyelite Vision in violation of the New York Antikickback Statute, N.Y. State Fin. L. § 198-b.

150. All of Defendants' conduct described in this Complaint was knowing, as that term is used in the New York False Claims Act.

WHEREFORE, Relator requests the following relief:

To the state of New York:

(1) Three times the amount of actual damages which the state of New York has sustained as a result of Defendant's conduct;
(2) A civil penalty of not less than $6,000 and not more than $12,000 for each false claim which Defendant caused to be presented to the state of New York;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) 25% of the proceeds recovered in this action if the State of New York elects to intervene, and 30% if it does not;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorney's fees and costs; and
(4) Such further relief as this Court deems equitable and just.

.

**COUNT IV**
**FLORIDA FALSE CLAIMS ACT**
**(Plaintiffs v. Mark Lodespoto, MD, Eyecuity, PLLC)**

151. Relator repeats and re-alleges each allegation contained in the foregoing paragraphs 1 through 150 above as if fully set forth herein.

152. This is a qui tam action brought by Relator on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 et seq.

153. Fla. Stat. § 68.082(2) provides liability for any person who-

(a) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;
(b) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.

154. Defendants violated Fla. Stat. § 68.082(2) and knowingly or recklessly caused false claims or statements to be made, used and presented to the State of Florida

155. The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, was unaware of Defendant's conduct and paid the claims submitted.

156. In addition, Defendant physicians who referred patents for testing received kickbacks for the referrals suggested by the Eyelite Vision in violation of the Florida Antikickback Statute, Fla. Stat. § 456.054.

157. As a result of Defendant's violation of Fla. Stat. § 68.082(2), the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

158. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of himself and the State of Florida.

WHEREFORE, Relator respectfully request this Court to award the following damages to the following parties and against Defendants:

To the State of Florida:

(1) Three times the amount of actual damages which the State of Florida has sustained as a result of Defendant's conduct;
(2) A civil penalty of not less than $5,500 and not more than $ 11,000 for each false claim which Defendant caused to be presented to the State of Florida;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action,
(3) An award of reasonable attorney's fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT V**
**TEXAS MEDICAID FRAUD PREVENTION LAW**
**(Plaintiffs v. Mark Lodespoto, MD, Lodespoto Medical, PLLC)**

159. Relator repeats and re-alleges each allegation contained in paragraphs 1 through 158 above as if fully set forth herein.

160. This is a qui tam action brought by Relator on behalf of the State of Texas to recover double damages and civil penalties under Tex. Hum. Res. Code § 36.001 et seq.

161. Tex. Hum. Res. Code § 36.002 provides liability for any person who-

(1) knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid Program that is not authorized or that is greater than the benefit or payment that is authorized:

(2) knowingly conceals or fails to disclose information that permits a person to receive benefit or payment under the Medicaid Program that is not authorized or is greater than the benefit or payment that is authorized;

(4) knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:
***
(B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program.

162. Defendants violated Tex. Hum. Res. Code § 36.002 and knowingly caused false claims to be made, used and presented to the State of Texas.

163. In addition, Defendant physicians who referred patents for testing received kickbacks for the referrals suggested by the Eyelite Vision in violation of the Texas Antikickback Statute.

164. The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, was unaware of Defendants' conduct and paid the claims submitted.

165. As a result of Defendants' violation of Tex. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

166. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tex. Hum. Res. Code § 36.101 on behalf of herself and the State of Texas.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the State of Texas:

(1) Two times the amount of actual damages which the State of Texas has sustained as a result of Defendant's conduct;
(2) A civil penalty of not less than $5,500 or more than $15,000 for each false claim which Defendant cause to be presented to the state of Texas;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Tex. Hum. Res. Code §36.110, and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorney's fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT VI**
**MASSACHUSETTS FALSE CLAIMS ACT**
**(Plaintiffs v. Mark Lodespoto, MD, Eyecuity)**

167. Relator repeats and re-alleges each allegation contained in paragraphs 1 through 166 above as if fully set forth herein.

168. This is a qui tam claim brought by Relator on behalf of the Commonwealth of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Chap. 12 § 5 et seq.

169. Mass. Gen. Laws Chap. 12 § 5B provides liability for any person who-

> (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

170. Defendants violated Mass. Gen. Laws Chap. 12 §5B and knowingly caused false claims to be made, used and presented to the Commonwealth of Massachusetts.

171. In addition, Defendant physicians who referred patents for testing received kickbacks for the referrals suggested by the Eyelite Vision in violation of the Massachusetts Antikickback Statute.

172. The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, was unaware of Defendants conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

173. As a result of Defendants' violation of Mass. Gen. Laws Chap. 12 §5B, the Commonwealth of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

174. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Mass. Gen. Laws Chap. 12 §5C on behalf of himself and the Commonwealth of Massachusetts.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the Commonwealth of Massachusetts:

(1) Three times the amount of actual damages which the Commonwealth of Massachusetts has sustained as a result of Defendant's conduct;
(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the Commonwealth of Massachusetts;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Mass. Gen. Laws Chap. 12, §5F and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorney's fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT VII**
**CONNECTICUT FALSE CLAIMS ACT**
**(Plaintiffs v. Mark Lodespoto, MD, Kessler Medical, LLC, Mendelsohn Medical, Kessler Medical Radiology)**

175. Relator repeats and realleges each allegation contained in paragraphs 1 through 174 above as if fully set forth herein.

176. This is a qui tam action brought by Relator and the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act, §17b-301a et. seq. (the "Act").

177. The Act provides liability for any person who

(1) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval under a state-administered health or human services program;
(2) knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claims under a state-administered health or human services program.

178. Defendants violated Conn. Code § 17b-301b by engaging in the illegal conduct described herein.

179. Defendants violated Conn. Code § 17b-301b and knowingly caused false claims to be made, used and presented to the State of Connecticut.

180. Connecticut, by and through the Connecticut Medicaid program and other state healthcare programs, was unaware of Defendants' illegal conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

181. In addition, Defendant physicians who referred patents for testing received kickbacks for the referrals suggested by the Eyelite Vision in violation of Connecticut's Antikickback Statute, C.G.S.A. § 53a-161c.

182. As a result of Defendants' violation of Conn. Code § 17b-301b, Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

183. Relator is a private citizen with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to Connecticut Code § 17b-301d on behalf of himself and the State of Connecticut.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To Connecticut:

(1) Three times the amount of actual damages which Connecticut has sustained as a result of Defendant's illegal conduct;
(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to Connecticut;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Conn. Code § 17b-301e and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorney's fees and costs; and
(4) Such further relief as this Court deems equitable and just.

**COUNT VIII**
**CALIFORNIA FALSE CLAIMS ACT**
**(Plaintiffs v. Mark Lodespoto, MD, Lodespoto Medicine of California, PC, Triangle Eye Institute)**

184. Relator repeat and re-allege each allegation contained in paragraphs 1 through 183 above as if fully set forth herein.

185. This is a qui tam action brought by Relators on behalf of the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 et seq.

186. Cal. Gov't Code § 12651 (a) provides liability for any person who

> (1) knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof, a false claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;
> (3) conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.
> . . .
> (B) is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

187. In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code § 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code §14107.2.

188. Defendants violated Cal. Bus. & Prof. Code § 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2 by engaging in the conduct described herein.

189. Defendants furthermore violated Cal. Gov't Code § 12651 (a) and knowingly caused false claims to be made, used and presented to the State of California by its deliberate and systematic violation of federal and state laws, including the FCA, federal Anti-Kickback Act, Cal. Bus. & Prof. Code § 650-650,1 and Cal. Welf. & Inst. Code § 14107.2 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government Health Care Programs.

190. The State of California, by and through the California Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

191. Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the State of California in connection with Defendants' conduct. Compliance with applicable California statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of California.

192. Had the State of California known of Defendants' wrongful conduct, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

193. As a result of Defendants' violation of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

194. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of herself and the State of California.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the State of California:

(1) Three times the amount of actual damages which the State of California has sustained as a result of Defendant's conduct;
(2) A civil penalty of not less than $5000 and not more than $10,000 for each false claim which Defendant presented or caused to be presented to the State of California;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(5) The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;
(6) Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(7) An award of reasonable attorney's fees and costs; and
(8) Such further relief as this Court deems equitable and just.

**JURY DEMAND**

Relator demands trial by jury for all claims for which such jury is available.

Dated: November 19, 2020

DUANE MORRIS LLP

/s/ Michael M Mustokoff
Michael M. Mustokoff (15674)
Daniel R. Walworth (204968)
Brett M. Feldman (322477)
Jessica Linse (327288)

30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: +1 215 979 1000
Fax: +1 215 979 1020

Attorneys for Plaintiff

Dated: November 19, 2020

**SERVICE LIST**

| | |
|---|---|
| The Honorable William Barr<br>Attorney General<br>United States Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001 | William M. McSwain<br>c/o Charlene K. Fullmer, AUSA<br>United States Attorney's Office<br>615 Chestnut Street<br>Suite 1250<br>Philadelphia, PA 19106 |
| Letitia A. James<br>Attorney General, New York<br>Office of the Attorney General<br>The Capitol<br>Albany, NY 12224-0341 | Gurbir S. Grewal<br>Attorney General, New Jersey<br>RJ Hughes Justice Complex<br>25 Market Street<br>Box 080<br>Trenton, NJ 08625-0080 |
| Ashley Moody<br>Attorney General, Florida<br>Office of the Attorney General<br>State of Florida<br>PL-01 The Capitol<br>Tallahassee, FL 32399-1050 | Ken Paxton<br>Attorney General, Texas<br>Office of the Attorney General<br>300 West 15th Street<br>Austin, TX 78701 |
| Xavier Becerra<br>Attorney General, California<br>Office of the Attorney General<br>1300 "I" Street<br>Sacramento, CA 95814-2919 | William Tong<br>Attorney General, Connecticut<br>Office of the Attorney General<br>165 Capital Avenue<br>Hartford, CT 06106 |
| Maura Healy<br>Attorney General, Massachusetts<br>Office of the Attorney General<br>1 Ashburton Place, 20th Floor<br>Boston, MA 02108 | John Crutchlow, AUSA<br>United States Attorney's Office<br>615 Chestnut Street<br>Suite 1250<br>Philadelphia, PA 19106 |

# EXHIBIT "1"

From: Samantha Platas <sam.bceye@gmail.com>
To: Gregory Scimeca <eyegreg@aol.com>; Jen Rispo <jrispo.bceye@gmail.com>; Gina Deveney <gina.bceye@gmail.com>; Tricia Lennox Thomas <tllennox@aol.com>; Tara Simpkins <tara.bceye@gmail.com>; Heather Roberson <heather.bceye@gmail.com>; Samantha Platas <sam.bceye@gmail.com>
Subject: Dr. Thomas Meeting Recap
Date: Thu, Apr 16, 2015 8:42 am

---

At the request of Dr. Scimeca and Jennifer, Tara and I met with Dr. Thomas this past Monday in Moorestown. The main focus of this meeting was to address the issues surrounding Dr. Thomas's exams in IFA. The meeting points/ proposed solutions are as follows:

1. Free text

We reviewed a report with Dr. Thomas given to us by Daniel at IFA displaying our charts that are near/ at capacity. According to IFA, all charts should be able to hold 50- 60 complete eye exams. Reviewing the report from Daniel showed the majority of our full charts are patients that mainly see Dr. Thomas. These charts are full with only 15- 20 visits per chart. Daniel warned that charts will fill up 3 times as fast when free text is predominantly used. Structured Data/ Free Text should be a 90/10, maybe 80/20 split in charts.

The main sections where Dr. Thomas has a large amount of free text are "Past Ocular History", "Ocular Procedures", "Past Medical History", and "Treatment Plan". We reviewed previous exams with Dr. Thomas and highlighted different information that was entered into these sections.

The point that was addressed is that the majority of the data Dr. Thomas enters into an exam as free text can be entered as structured data in a proper location.

SOLUTION: Dr. Thomas will begin to enter all her exam findings in the correct locations within the chart. It will now be an expectation that her exams will be majority structured data, with very little, to no free text.

SOLUTION: If Dr. Thomas finds there is information she must add to a chart, but with no option for structured data, she is to submit a list of these exam findings to the Meaning Use team (Tara, Heather, and myself) at the end of her office hours each day.

SOLUTION:

Once they have been submitted, the MU team will be expected to troubleshoot these concerns and further customize the system to incorporate the information as structured data.

2. Communication of IFA-related issues

Dr. Thomas expressed that she has discussed many issues she has with her exams and IFA to staff members. However, the majority were issues we were hearing for the first time when we met on Monday, since the concerns had not been relayed to us by the staff she spoke with.

SOLUTION: Going forward, Dr. Thomas will solely report these issues/ concerns to the MU team. By following this protocol, we can ensure that all issues are acknowledged and addressed.

3. Incorrect diagnosis codes being entered

Dr. Thomas states that one of the most time-consuming portions of her exams is having to correct diagnosis codes that are being entered incorrectly when a patient is in the OR. In addition, since not all codes from the exam prior to surgery are being used in the OR, she needs to re-enter everything since not all codes are being carried over.

SOLUTION: If Dr. Thomas notices this issue during an exam, she will give the patient's name and corrections to the Meaningful Use team, and they will correct the chart. She will no longer make the corrections herself.

SOLUTION: Jennifer will speak with Kara regarding incorrect diagnosis codes being entered in the OR. Jennifer will explain that ONLY codes appearing on booking sheets should be entered on surgery dates. She will also advise that any OR staff that is unsure of the correct codes should contact the Meaningful Use team.

4. Previous exams being cloned

Upon reviewing charts, we noticed there was information being pulled over from previous exams, and not being changed/ deleted/ updated. When the notes are finalized, these findings/ orders are being saved to the present DOS. Tara and I explained this is a huge issue if we were to ever be audited.

SOLUTION: Effective immediately, screening technicians will no longer be pulling over Dr. Thomas's last treatment plan. Dr. Thomas will be expected to create a new/ unique treatment plan (consisting of structured data) for every exam.

5. Uniform data entry for all physicians

When asked her reasoning behind how she enters information into the chart, Dr. Thomas states this is the way she wishes to see information. We explained that as a part of our practice, all physicians are expected to enter information in a uniform manner. This not only maximizes our system, but it also allows for easy navigation for all other physicians when they see the same patient, as well as eliminates confusion for any other staff member who reviews the chart (i.e. surgical coordinators).

SOLUTION: Dr. Thomas states she knows where everything is expected to be entered, and she declined additional training for navigating the system. Dr. Thomas understands she will now be expected to enter information (as structured data) in the appropriately designated areas.

SOLUTION: In the past, screening technicians entered information in the manner Dr. Thomas requested, not how it is entered for all other physicians. Going forward, screening techs have now been instructed to work up Dr. Thomas's patients exactly as they would any other physician's.

6. Findings being entered more than once in an exam note

Many exams had the same information entered twice, sometimes three separate times, on the same DOS. We explained that this not only takes up chart space, but more importantly eats into her exam time, causing a longer wait for patients.

SOLUTION: Tara and I confirmed that Dr. Thomas knows the appropriate places to enter and find this information. Going forward, Dr. Thomas will be expected to enter the information only once and in the correct area.

7. Only Diagnosis should be entered under the Diagnosis tab

We noticed that Dr. Thomas has been entering exam data that is not specific diagnosis codes under the "Diagnosis ICD" portion of her exams (i.e. past procedures, etc). When asked, Dr. Thomas states she deliberately does this so it is easier for her to find.

SOLUTION: Only Diagnosis codes (entered as structured data) will be entered under the Diagnosis section. We explained the reasoning behind this is that any other information entered will severely effect us once we switch to electronic billing, amongst other concerns.

SOLUTION: Dr. Thomas was shown where she can easily find the additional information she is currently entering under Diagnosis (namely, all past procedures are visible in the top right corner while navigating the entire chart).

SOLUTION: If Dr. Thomas finds a diagnosis code is not available as structured data, she is to communicate the code to the Meaningful Use team. The MU team will then be expected to

add and map the code in the system.

8. IFA Capabilities versus IFA limits

Tara and I feel Dr. Thomas's largest concern is that she has been told repeatedly by IFA that they cannot have the system tweaked to what she expects for her exams.

SOLUTION: While we understand this to be frustrating, we asked that she begin to accept the notion that unfortunately, all of her expectations cannot be met. We did, however, explain there is plenty of customizing that can be done, either by the Meaningful Use team, or IFA. We expect her to begin to concentrate more on the capabilities the system has to offer, rather than the limits.

SOLUTION: The MU team will be expected to address all concerns Dr. Thomas communicates, and customize the system as best as the system will allow.

In summary, the main theme of these solutions is communication between Dr. Thomas and the Meaningful Use team. Without communication regarding ALL concerns, it will be impossible to reach the goals we have mentioned above.

That being said, Dr. Thomas is now expected to print out a copy of her schedule everyday and jot down issues/ obstacles she comes across within each chart. At the end of the day, this schedule must be turned over to the Meaningful Use team so they can begin to research solutions. Also, Dr. Thomas is encouraged to communicate all concerns to the MU team via email or in person. These issues can no longer be communicated to any other staff members.

At Dr. Scimeca and Jennifer's request, the Meaningful Use team will begin to review Dr. Thomas's exams that are documented after this email. Our findings will be reported to Dr. Scimeca and Jennifer on a weekly basis. These reports will also be sent to Dr. Thomas via email. The purpose of these reports is to ensure a line of communication and a team effort between Dr. Thomas, the MU team, and management. If we all work together on this, we are very confident we can achieve a solution that is acceptable to all.

Thank you,

Sam

# EXHIBIT "2"

**2017 Medicare Provider Utilization and Payment Data: Physician and Other Supplier PUF CY2017**

**Top Billers of Medicare for Billing Codes 93880, 93886, 93890 and 93892**

**93880 Duplex scan of extracranial arteries, complete bilateral study**

| Rank | NPI # | Provider | # of Services | Average Medicare Payment | Total Medicare Payments |
|---|---|---|---|---|---|
| 1 | 1902896541 | Mark Lodespoto | 6674 | 180.41099341 | 1,204,062.90 |
| 2 | 1891081030 | Pro Imaging Services | 2243 | 156.06037896 | 350,043.40 |
| 3 | 1255361283 | Yefim Vaynshelbaum | 2191 | 36.415344592 | 79,786.02 |
| 4 | 1699867598 | Ali Aburahma | 2152 | 30.766155562 | 66,208.76 |
| 5 | 1356398713 | Sergio Sokol | 1970 | 153,04161929 | 301,491.97 |

**93886 Transcranial doppler study of the intracranial arteries, complete study**

| Rank | NPI # | Provider | # of Services | Average Medicare Payment | Total Medicare Payments |
|---|---|---|---|---|---|
| 1 | 1902896541 | Mark Lodespoto | 9340 | 235.64986617 | 2,200,969.60 |
| 2 | 1154326049 | Pradeep Amesur | 2334 | 36.756887524 | 85,794.72 |
| 3 | 1891081030 | Pro Imaging Services | 2059 | 164.82677028 | 339,378.31 |
| 4 | 1255361283 | Yefim Vaynshelbaum | 2002 | 42.113606394 | 84,311.44 |
| 5 | 1174921456 | Universal Imaging Co | 1533 | 164.9149576 | 252,814.61 |

**93890 Transcranial Doppler Study of the intracranial arteries, Vasoreactive Study**

| Rank | NPI # | Provider | # of Services | Average Medicare Payment | Total Medicare Payments |
|---|---|---|---|---|---|
| 1 | 1902896541 | Mark Lodespoto | 9385 | 239.1132458 | 2,244,077.70 |
| 2 | 1154326049 | Pradeep Amesur | 2181 | 40.323704723 | 87,945.99 |
| 3 | 1689601528 | Ernest Scarnati | 1077 | 241.37148561 | 259,957.08 |
| 4 | 1457692550 | New Wave Imaging | 1015 | 163.6764532 | 166,131.59 |
| 5 | 1417119124 | Anuraag Sahai | 837 | 42.32555556 | 35,426.48 |

**93892 Transcranial Doppler Study of the intracranial arteries, Emboli detection without Intravenous microbubble injection**

| Rank | NPI # | Provider | # of Services | Average Medicare Payment | Total Medicare Payments |
|---|---|---|---|---|---|
| 1 | 1902896541 | Mark Lodespoto | 8999 | 145.87067007 | 1,312,690.10 |
| 2 | 1154326049 | Pradeep Amesur | 2188 | 47.213638026 | 103,303.53 |
| 3 | 1891081030 | Pro Imaging Services | 2063 | 106.72887542 | 220,181.65 |
| 4 | 1255361283 | Yefim Vaynshelbaum | 2002 | 54.170529471 | 108,449.39 |
| 5 | 1174921456 | Universal Imaging Co | 1533 | 106.7553816 | 163,655.99 |

**2016 Medicare Provider Utilization and Payment Data: Physician and Other Supplier PUF CY2016**

**<u>Top Billers of Medicare for Billing Codes 93880, 93886, 93890 and 93892</u>**

**93880 Duplex scan of extracranial arteries, complete bilateral study**

| Rank | NPI # | Provider | # of Services | Average Medicare Payment | Total Medicare Payments |
|---|---|---|---|---|---|
| 1 | 1902896541 | Mark Lodespoto | 9204 | 173.84470122 | 1,600,066,60 |
| 2 | 1891081030 | Pro Imaging Services | 3093 | 137.07759134 | 423,980.98 |
| 3 | 1255361283 | Yefim Vaynshelbaum | 2462 | 36.532770106 | 89,943.68 |
| 4 | 1699867598 | Ali Aburahma | 2399 | 28.160333472 | 67,556.64 |
| 5 | 1336247691 | Frederic Mendelsohn | 650 | 178.49498462 | 116,021.73 |

**93886 Transcranial doppler study of the intracranial arteries, complete study**

| Rank | NPI # | Provider | # of Services | Average Medicare Payment | Total Medicare Payments |
|---|---|---|---|---|---|
| 1 | 1902896541 | Mark Lodespoto | 9444 | 178.38052944 | 1,684,625.60 |
| 2 | 1891081030 | Pro Imaging Services | 3982 | 144.74069814 | 576,357.42 |
| 3 | 1255361283 | Yefim Vaynshelbaum | 3400 | 43.515526471 | 147,952.78 |
| 4 | 1336247691 | Frederic Mendelsohn | 2398 | 183.11055463 | 183,110.55 |
| 5 | 1629048319 | Joseph Skeens | 1642 | 43.608246041 | 64,758.24 |

**93890 Transcranial Doppler Study of the intracranial arteries, Vasoreactive Study**

| Rank | NPI # | Provider | # of Services | Average Medicare Payment | Total Medicare Payments |
|---|---|---|---|---|---|
| 1 | 1902896541 | Mark Lodespoto | 9098 | 181.62116069 | 1,652,389.30 |
| 2 | 1891081030 | Pro Imaging Services | 3564 | 145.20861392 | 517,523.48 |
| 3 | 1255361283 | Yefim Vaynshelbaum | 2969 | 46.918507915 | 259,957.08 |
| 4 | 1336247691 | Frederic Mendelsohn | 1258 | 190.50883148 | 239.660.10 |
| 5 | 1457692550 | New Wave Imaging | 1056 | 144.47680871 | 152,567.50 |

**93892 Transcranial Doppler Study of the intracranial arteries, Emboli detection without Intravenous microbubble injection**

| Rank | NPI # | Provider | # of Services | Average Medicare Payment | Total Medicare Payments |
|---|---|---|---|---|---|
| 1 | 1902896541 | Mark Lodespoto | 9099 | 133.10776459 | 1,211,147.50 |
| 2 | 1891081030 | Pro Imaging Services | 3565 | 87.305929874 | 311,245.63 |
| 3 | 1255361283 | Yefim Vaynshelbaum | 2969 | 56.848777366 | 168,784.01 |
| 4 | 1336247691 | Frederic Mendelsohn | 1257 | 138.58395386 | 174,200.02 |
| 5 | 1457692550 | New Wave Imaging | 1053 | 87.306239316 | 91,933.47 |

**2015 Medicare Provider Utilization and Payment Data: Physician and Other Supplier PUF CY2015**

**Top Billers of Medicare for Billing Codes 93880, 93886, 93890 and 93892**

**93880 Duplex scan of extracranial arteries, complete bilateral study**

| Rank | NPI # | Provider | # of Services | Average Medicare Payment | Total Medicare Payments |
|---|---|---|---|---|---|
| 1 | 1336247691 | Frederic Mendelsohn | 4946 | 185.62412859 | 918,096.89 |
| 2 | 1902896541 | Mark Lodespoto | 4064 | 177.32892717 | 720,664.73 |
| 3 | 1891081030 | Pro Imaging Services | 3102 | 140.60024823 | 436,141.94 |
| 4 | 1699867598 | Ali Aburahma | 2858 | 28.19846746 | 80,591.21 |
| 5 | 1629048319 | Joseph Skeens | 2475 | 66.295907071 | 83,267.65 |

**93886 Transcranial doppler study of the intracranial arteries, complete study**

| Rank | NPI # | Provider | # of Services | Average Medicare Payment | Total Medicare Payments |
|---|---|---|---|---|---|
| 1 | 1336247691 | Frederic Mendelsohn | 5593 | 214.06511175 | 1,197,266.10 |
| 2 | 1902896541 | Mark Lodespoto | 4010 | 206.75310224 | 829,079.93 |
| 3 | 1821285487 | Daniel Shifteh | 3322 | 41.961068633 | 139,394.66 |
| 4 | 1891081030 | Pro Imaging Services | 2692 | 177.40632615 | 477,577.65 |
| 5 | 1629048319 | Joseph Skeens | 2083 | 93.984080653 | 195,768.83 |

**93890 Transcranial Doppler Study of the intracranial arteries, Vasoreactive Study**

| Rank | NPI # | Provider | # of Services | Average Medicare Payment | Total Medicare Payments |
|---|---|---|---|---|---|
| 1 | 1336247691 | Frederic Mendelsohn | 5562 | 168.64095829 | 937,980.96 |
| 2 | 1902896541 | Mark Lodespoto | 4001 | 161.76793052 | 647,233.48 |
| 3 | 1821285487 | Daniel Shifteh | 3294 | 45.556645416 | 150,063.58 |
| 4 | 1891081030 | Pro Imaging Services | 2686 | 127.60434103 | 342, 745,25 |
| 5 | 1477550135 | Fred Fefer | 1294 | 172.72591963 | 223, 507.32 |

**93892 Transcranial Doppler Study of the intracranial arteries, Emboli detection without Intravenous microbubble injection**

| Rank | NPI # | Provider | # of Services | Average Medicare Payment | Total Medicare Payments |
|---|---|---|---|---|---|
| 1 | 1336247691 | Frederic Mendelsohn | 5564 | 174.12071352 | 968,807.63 |
| 2 | 1902896541 | Mark Lodespoto | 4001 | 167.09897276 | 668,562.97 |
| 3 | 1821285487 | Daniel Shifteh | 3259 | 52.997474685 | 172,718.76 |
| 4 | 1891081030 | Pro Imaging Services | 2682 | 127.60367636 | 342,233.04 |
| 5 | 1477550135 | Fred Fefer | 1292 | 180.10309598 | 232,693.19 |

# EXHIBIT "3"

Mustokoff, Michael M. <mmustokoff@duanemorris.com>

1.

FW: PA patient

To LINDA Grobman <lgrobman@comcast.net>

Please copy

**From:** TRICIA LENNOX <tllennox@aol.com>
**Sent:** Wednesday, October 21, 2020 3:13 PM
**To:** Mustokoff, Michael M. <MMustokoff@duanemorris.com>
**Subject:** PA patient

On 9/3/20 I saw an old patient of mine from The Eye Professionals (Carol Pliner). She was upset and wanted to talk to me privately and asked the exam room door to be closed. She was seeing Vince Sardi for macular degeneration but did not want to travel to the Willingboro office in NJ. Instead, she saw him at one of his other offices(Total Eye Care in Levittown, PA). On the day of her follow-up, Dr. Sardi was not there. He was not seeing patients due to CoVID-19. Instead, she was asked to have a test on blood flow. She declined but felt pressured to do the test anyway. She felt the test was wrong and only being done for money since she was Medicare. She was then called back to "review the results". Instead she saw Dr Stein who wanted to order more tests and didn't even review the blood flow test. Ms. Pliner requested a referral to another retina doctor. She did not want to go back to Total Eye Care as she did not trust them.

I am concerned the test was Transcranial dopplers and Dr Sardi introduced Total Eye Care to Eyelite Vision. I requested records in 9/3/20 but have not receive any records to date. I sent a second request last week. I will let you know if I receive anything.



SOLOMON C. LUO, M.D., F.A.C.S.
Cataract, Laser & Refractive Surgery
Anterior Segment Specialist

MARIA E. BARBE, M.D.
Pediatric & Adult Strabismus
General Eye Care

SHANN B. LIN, M.D., F.A.C.S.
Macular Degeneration & Diabetic Eye
Disease Vitreo-Retinal Surgeon

ANTHONY F. GROSSO, JR., D.O., F.A.O.C
Comprehensive Ophthalmologist
Eye Disease and Surgery

WILLIAM T. KELLOGG, M.D.
Comprehensive Ophthalmologist
Eye Disease and Surgery

SCOTT D. PIETTE, D.O.
Glaucoma Specialist and Surgery

CRISTAN M. ARENA, M.D.
Glaucoma Specialist and Surgery

BETSY P. LUO, M.D., M.P.H.
Comprehensive Ophthalmologist
Oculoplastics
Eye Disease and Surgery

STELLA L. LUO, M.D.
Comprehensive Ophthalmologist
Eye Disease and Surgery

CAESAR K. LUO, M.D.

2.

Vitreo-Retinal Surgeon

**MELISSA D. NEUWELT, M.D.**
Macular Degeneration & Diabetic Eye Disease
Vitreo-Retinal Surgeon

**PAUL H. SCHENCK, M.D.**
Comprehensive Ophthalmologist

**PEGGY A. DIXON, O.D.**
General Eye Care, Contact Lens

**ANN MARIE BLEHM, O.D.**
General Eye Care, Contact Lens

**AARON R. BLEHM, O.D.**
General Eye Care, Contact Lens

**AMANDA EHRGOOD-PERRY, O.D.**
General Eye Care, Contact Lens

**IRENE MUSTEN, O.D.**
General Eye Care, Contact Lens

**JULIE L. MARSH, O.D.**
General Eye Care, Contact Lens

201 E. Laurel Blvd., Pottsville, PA 17901
Phone 570-628-4444 • Fax: 570-628-3088
info@pvi-vision.com

1300 Broadcasting Rd., Wyomissing, PA 19610
Phone 610-396-9999 • Fax 610-396-1488

5239 Hamilton Blvd., Allentown, PA 18106
Phone 610-530-4444 • Fax 610-366-1343

8401 Bustleton Ave., Philadelphia, PA 19152
Phone 215-745-5050 • Fax 215-342-4007

100 East Lehigh Ave., Philadelphia, PA 19125
Phone 215-707-1830 • Fax 215-707-1835

214 E. Independence St., Shamokin, PA 17872
Phone 570-648-4444 • Fax 570-648-0552

3

SOLOMON C. LUO, M.D., F.A.C.S.
Cataract, Laser & Refractive Surgery
Anterior Segment Specialist

MARIA E. BARBE, M.D.
Pediatric & Adult Strabismus
General Eye Care

SHANN B. LIN, M.D., F.A.C.S.
Macular Degeneration & Diabetic Eye Disease Vitreo-Retinal Surgeon

ANTHONY F. GROSSO, JR., D.O., F.A.O.C.O.
Comprehensive Ophthalmologist
Eye Disease and Surgery

WILLIAM T. KELLOGG, M.D.
Comprehensive Ophthalmologist
Eye Disease and Surgery

SCOTT D. PIETTE, D.O.
Glaucoma Specialist and Surgery

CRISTAN M. ARENA, M.D.
Glaucoma Specialist and Surgery

BETSY P. LUO, M.D., M.P.H.
Comprehensive Ophthalmologist
Oculoplastics
Eye Disease and Surgery

STELLA L. LUO, M.D.
Comprehensive Ophthalmologist
Eye Disease and Surgery

CAESAR K. LUO, M.D.
Macular Degeneration & Diabetic Eye Disease
Vitreo-Retinal Surgeon

MELISSA D. NEUWELT, M.D.
Macular Degeneration & Diabetic Eye Disease
Vitreo-Retinal Surgeon

PAUL H. SCHENCK, M.D.
Comprehensive Ophthalmologist

PEGGY A. DIXON, O.D.
General Eye Care, Contact Lens

ANN MARIE BLEHM, O.D.
General Eye Care, Contact Lens

AARON R. BLEHM, O.D.
General Eye Care, Contact Lens

AMANDA EHRGOOD-PERRY, O.D.
General Eye Care, Contact Lens

IRENE MUSTEN, O.D.
General Eye Care, Contact Lens

JULIE L. MARSH, O.D.
General Eye Care, Contact Lens

201 E. Laurel Blvd., Pottsville, PA 17901
Phone 570-628-4444 • Fax 570-628-3088
info@pvi-vision.com

1300 Broadcasting Rd., Wyomissing, PA 19610
Phone 610-396-9999 • Fax 610-396-1488

5239 Hamilton Blvd., Allentown, PA 18106
Phone 610-530-4444 • Fax 610-366-1343

8401 Bustleton Ave., Philadelphia, PA 19152
Phone 215-745-5050 • Fax 215-342-4007

100 East Lehigh Ave., Philadelphia, PA 19125
Phone 215-707-1830 • Fax 215-707-1835

214 E. Independence St., Shamokin, PA 17872
Phone 570-648-4444 • Fax 570-648-0552

Ashland

Shenandoah

# PROGRESSIVE VISION INSTITUTE
## EYE CARE CENTER
"DEDICATED TO SURGICAL EXCELLENCE"

### Authorization for Release of Information

Patient Name: Carol Pliner

Patient Address: 261 Fairway Drive, Warminster PA 18974

Patient DOB: 05-24-1947

*hereby authorize and request (please circle):*

Progressive Vision Institute
Eye Care Center
100 E Lehigh Avenue
Philadelphia, PA 19125
Fax 215-707-1835

(circled) Progressive Vision Institute
Eye Care Center
8401 Bustleton Avenue
Philadelphia, PA 19152
Fax 215-342-4007

**(circled) To obtain or to furnish** *(please circle)*

- ☑ All Eye Records (including any testing and procedures)
- ☐ All Clinic Records
- ☑ Visual Fields
- ☐ Allergy Records
- ☐ X-Rays
- ☐ Lab Reports
- ☐ Office Notes
- ☐ Photographs
- ☐ Electrocardiograms
- ☐ Immunization Records
- ☑ Other (Specify) testing

**(circled) From or To** *(please circle)*

***Name of Physician:*** Sardi / Stein   Tel (215) 943-7800

***Healthcare Facility:*** Total Eye Care – Levittown

***Address:*** 1568 Woodbourne Rd, Levittown, PA 19057

***Fax Number:*** (215) 943-5799

***For the Following Dates:*** ____________

In compliance with state statutes which require special permission to release otherwise privileged information, please release records pertaining to:

- ☐ Mental health
- ☐ AIDS test results
- ☐ Drug abuse
- ☐ Alcoholism
- ☐ AIDS-related disease diagnosis
- ☐ Developmental disabilities
- ☐ Other

**Purpose or need for disclosure:** (check applicable categories)

- ☐ Further medical care
- ☐ Payment of insurance claim
- ☐ Legal Investigation
- ☐ Personal
- ☐ Application for insurance
- ☐ Other
- ☐ Vocational rehabilitation evaluation
- ☐ Disability determination

*I understand that this authorization shall be valid for one (1) year unless otherwise stated below or revoked through written notice to Medical Records.

[signature] ____________
(Alternate date if not one (1) year)

I authorize the release of my medical records in accordance with the specifications listed above. I understand written notice is necessary to cancel this request.

**Signature of Patient** [signature] **Date:** 9/3/20

(if signed by person other than patient, state relationship and authorization to do so)

Patient is: ☐ Minor ☐ Incompetent ☐ Disabled ☐ Deceased

Legal Authority: ☐ Legal ☐ Legal guardian ☐ Next of kin of deceased

Tm < 4

OCT <

∅ BDR OU
POH

OAG OU
ARMD OU
dry, inter

cataracts OU
PVD OU

Ta < 18 / 18

N&M

NS

Letter to Dr. Bueno

P

Bill EP Est

Impression/Plan:

5




Tricia Thomas

Sent from my iPhone

For more information about Duane Morris, please visit http://www.DuaneMorris.com

Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

- IMG_2643.jpg (3 MB)
- IMG_2644.jpg (3 MB)

6


Ashland
Shenandoah


Office: Willingb
Bucks
Name:
Referred by:
Reason for Con
Still
No old
records
requested
x 2